UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Bellandra Foster, et al.,

        Plaintiffs,

v.

Victor Judnic, et al.,

        Defendants.

_____/

Case No. 11-14853

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [54]**

Before the Court is Defendants Rick Snyder, Kirk T. Steudle, Victor Judnic, and Mark Steucher's motion for summary judgment on Plaintiffs BBF Engineering Services, PC, and Bellandra Foster's first amended complaint. Plaintiffs allege that the Michigan Department of Transportation (MDOT), through Judnic and Steucher, discriminated against her, in violation of 42 U.S.C. §§ 1983 and 1981, based on Plaintiff Foster's gender and race, by not awarding BBF various consulting contracts. Plaintiffs also allege that Defendants violated the Michigan Whistleblowers' Protection Act (WPA), Mich. Comp. Laws § 15.361 et seq., by taking an adverse action against Plaintiff Foster and BBF when she filed a Title VI complaint against MDOT. (Dkt. 50.)

Because the Court finds that Plaintiff Foster has not met her burden in bringing forth evidence that Defendants treated similarly-situated individuals or entities differently than her and because she cannot establish a class-of-one equal protection theory, Plaintiffs' discrimination claims cannot survive summary judgment. Because the Court finds that

Plaintiffs' WPA claim fails under various arguments, as the Court discusses below, the Court dismisses that claim as well.

For the reasons explained below, therefore, the Court GRANTS Defendants' motion for summary judgment and dismisses this case.

## I.   Facts

### A.  Background

Plaintiff Foster, an African-American woman, is a professional engineer, licensed and registered in Michigan.  (Dkt. 42, Am. Compl. ¶¶ 3, 17, 18.)  She is the president and sole shareholder of Plaintiff BBF Engineering (BBF), an engineering consulting firm.  BBF is a certified Disadvantaged Business Enterprise (DBE).[1]  (*Id.* ¶ 32.)

This lawsuit involves Plaintiff and BBF's relationships with MDOT, its practices, its director, and its employees.  Defendant Rick Snyder is the Governor of Michigan.  (Am. Compl. ¶ 10.)  Plaintiffs allege that Snyder is liable and can enforce any injunctive relief the Court could award because he "is connected to and has responsibility for MDOT and its consulting contracts."  (Pls.' Resp. at 38.)  Defendant Kirk Steudle is MDOT's director. (Compl. ¶ 11.)  Plaintiffs allege that Steudle is liable because he is MDOT's director and oversees its budget and "is responsible for the construction, maintenance[,] and operation of nearly 10,000 miles of state highways and more than 4,000 state highway bridges." (Pls.' Resp. at 38-39.)  Defendant Victor Judnic and Defendant Mark Steucher were, at the

---

[1]"The overall goal fo the DBE program is to ensure that firms owned and controlled by minorities, women, and other socially and economically disadvantaged persons have the opportunity to grow and become self sufficient."   MDOT website, available at http://www.michigan.gov/mdot/0,1607,7-151-9625_21539_23108---,00.html (last visited June 21, 2013).

times relevant to this case, MDOT project engineers/project managers. (Compl. ¶¶ 12, 13.) Plaintiffs base their gender and race discrimination claims on statements that Judnic and Steucher allegedly made.

Plaintiff Foster and BBF sue Defendants for allegedly-discriminatory practices they took against her and BBF in MDOT contract bidding and awarding processes. In1997, Plaintiff states, she and BBF began providing contract work and consulting services to MDOT. (Am. Compl. ¶ 9.)

### B.  The MDOT contract-bidding process

Defendants have submitted an explanation of how MDOT bidding works. (Defs.' Mot. for Summ. J. at 1-2.) They state MDOT selects professional engineering firms in accordance with the Brooks Act, 40 U.S.C. § 1101, et seq., 23 U.S.C. § 112. (*Id.* at 1.) The Brooks Act, they say, requires selections based on a firm's qualifications, and not on price. (*Id.*) Defendants state that MDOT has published a "Selection Guidelines for Service Contracts," which implements 23 U.S.C. § 112's mandate. (*Id.*) They explain that MDOT publishes a Request for Proposals (RFP) to advertise the intended scope of the project work and other relevant details. (*Id.*) After MDOT issues the RFP, Defendants state that interested firms must submit a proposal detailing its qualifications, personnel, and information relating to any subconsultants that may perform work on the contract. (*Id.*)

To award a contract over $25,000.00 to a firm, Defendants state that MDOT "convenes a selection team to evaluate the proposals." (Defs.' Resp. at 1.) The selection team, Defendants maintain, reviews the proposals and assigns scores for each proposal in accordance with a scoring worksheet. (*Id.* at 1-2.) After the team meets and tallies the scores, Defendants represent that MDOT forwards the scores to the Central Selection

3

Review Team in Lansing for final approval. (*Id.* at 2.) If the CSRT approves the scores, then the project engineer requests a "price proposal," then negotiations start, and if the parties reach an agreement, then the consultant and MDOT enter a contract for the project work. (*Id.*)

As Plaintiff Foster understands the RFP process, she alleges that the project engineer "has basically the ultimate power." (Pls.' Resp. Ex. 12, Foster Dep. at 38.) She maintains that the project engineer assists in writing the RFP and has a primary hand in picking the selection panel. (*Id.*) She further alleges that the project engineers often, before the selection committee meets, have decided on which companies they want to work with. (*Id.* at 39-40.)

### C. Judnic's alleged discriminatory statement

Plaintiff Foster bases much of her discrimination claim on a statement Judnic made in 2006, which his word-processing assistant, Mary Caldwell heard. (Pls.' Resp., Ex. 2, Caldwell Dep.) Caldwell stated that she heard Judnic say that "no woman should be making that kind of money." (*Id.* at 31.) She explained that she could not, with one-hundred percent certainty state that Judnic directed his statement at BBF or Plaintiff Foster. (*Id.*) Caldwell stated that she did not know whether a woman other than Plaintiff Foster was working for MDOT at the time that Judnic allegedly made the statement. (*Id.*) She stated, though, that she was not aware of any other woman-owned company that was working at the time Judnic allegedly made the statement. (*Id.* at 32-33.) Caldwell said that Judnic's statement was about gender, women, and not about race. (*Id.* at 35.) She stated that she did not think that he said anything akin to "no Black woman." (*Id.*)

4

Caldwell told Plaintiff Foster about the statement, but that she did not remember if she told Plaintiff Foster immediately or even that year.  (Caldwell Dep. at 34.)

When questioned whether BBF experienced a change in the amount of work it received from MDOT, Caldwell stated that she noticed that Plaintiff Foster and her people were not around as much as they had been before.  (Caldwell Dep. at 36-37.)

### D.  MDOT cuts Plaintiffs' Contract 2006-0490 in half

Also in 2006, Plaintiffs submitted a proposal for an RFP for an MDOT project on Michigan's M-10 highway, the Lodge Freeway.  (Foster Dep. at 44-45.)  Plaintiff Foster stated that Judnic was the project engineer on the project.  Sometime after she submitted her proposal, Plaintiff Foster stated that MDOT had selected BBF for the contract, but that Judnic later called her and told her that MDOT was cutting half of the contract and was going to re-bid the other half.  (*Id.* at 46.)  Plaintiff Foster added that Judnic told her that Lansing made the decision to re-bid the contract.  (*Id.* at 47.)  The contract was reduced from $4.2 million to $2.2 million.

Plaintiff Foster alleged that the contract cut evidenced discrimination, either based on gender or race, because MDOT did not cut any other firm's contract.  (Foster Dep. at 49.)  Plaintiff Foster stated that BBF ultimately received the reduced portion of the contract, an "as-needed" services contract, but that the contract did not include work on M-10, which was part of the original contract. (*Id.* at 51-52.)  Plaintiff Foster acknowledged, though, that BBF did not bid on the M-10 portion of the contract after the original contract was cut and MDOT awarded her the as-needed services contract.  (*Id.* at 55.)

Judnic recalled that he had received a message from Lansing "that the contract was going to be reduced so that [Lansing] could get more work to people in the industry."

5

(Judnic Dep. at 89.)  Judnic explained that Lansing meant to spread the work around to more consultants, not just more DBEs.  (*Id.* at 90.)

The second half of the M-10 contract was awarded to Fishbeck, a large, non-DBE consulting firm.

Plaintiff Foster testified that MDOT did not cut anyone else's contract in half, and that fact shows discrimination based on race and gender.  (Foster Dep. at 49.)

Defendants have also submitted affidavits supporting their position that Judnic was not responsible for cutting BBF's contract.  (Defs.' Mot. at 3; Ex. 6, Kratofil Aff. ¶ 4; Ex. 7, Screws Aff. ¶ 4.)

### E.  MDOT attempts to reduce Plaintiff's Contract 2008-0044

In 2008, Plaintiffs allege that MDOT attempted to cut another contract that BBF was awarded, contract 2008-0044.  (Foster Dep. at 61-62.)  Foster stated that Jason Voigt was the person who indicated to her that MDOT was reducing the contract duration from two years to one year.  (*Id.*, Am. Compl. ¶ 43.)  Foster stated, though, that she contacted Myron Frierson, Voigt's supervisor, and after that contact, MDOT did not reduce the contract duration.  (Foster Dep. at 62-63.)

### F.  Plaintiff Foster meets with Judnic on July 18, 2008 and Judnic details issues that MDOT had had with Love Charles, one of Plaintiffs' technicians

Plaintiff Foster requested debriefing meetings, which Judnic would not conduct with her, at first.  (Foster Dep. at 73.)  She conceded, though, that she has no evidence that Judnic would not conduct these meetings because of her gender or race.  (*Id.*)  She stated that there had to be some reason, though, why he would not meet with her.  (*Id.*)

6

On July 18, 2008, though, Judnic and Voigt had a meeting with Plaintiff Foster to discuss BBF's performance.  (Foster Dep. at 83-84.)  At the meeting, Plaintiff Foster received a list of issues that MDOT had with BBF on the M-10 job and with Love Charles. (Defs.' Mot., Ex. 14, Meeting Minutes.)

Love Charles worked for BBF from 1997 until 2008, in the capacity as DBE technician. (Foster Dep. at 83.)  Charles stated that Judnic and his team took issue with him not logging his calls.  (Pls.' Resp., Ex. 4, Charles Dep. at 53.)  He stated that Judnic treated him like a child.  (*Id.*)  Charles testified that his experience gave BBF "points" for when BBF submitted RFPs.  (Charles Dep. at 71.)  He stated that he told Plaintiff Foster that, when he retired, she would be done, because he gave her a significant amount of points in the RFP process. (*Id.*)

Charles also testified that one of the issues that Judnic addressed at the July 18, 2008 debriefing was Charles's failure to keep certain files up to date.  (Charles Dep. at 41.) Charles stated that he understood that "certain things" were to "be in the files at certain times." (*Id.*)  After Charles left the meeting, he found the missing items and returned them to Plaintiff Foster.  (*Id.*)

Charles stated that he was forced out of his job as a consultant with MDOT.  (Charles Dep. at 45.)

### G. The Gateway Project billing issues

Around June, 2010, Plaintiffs were working on the Gateway Project as a subconsultant with URS, another consulting firm.  (Foster Dep. at 123.)  Plaintiffs were not getting paid for the services they were rendering.  (*Id.* at 122-23.)  When Plaintiff Foster inquired about the nonpayment, she stated that she learned that URS was not even submitting BBF's

invoices.  (*Id.* at 123.)  Plaintiff Foster alleged that Judnic played a role because he was the project manager on the project and the project manager reviews every invoice that gets submitted.  (*Id.* at 124.)  Plaintiff Foster further alleged that Judnic's failure to question URS as to why it was not submitting BBF's invoice is discrimination because he had "no concern whether [Plaintiffs were paid.]" (*Id.* at 127.)  Plaintiffs ultimately received payment for the work they performed on the Gateway project.  (*Id.* at 128.)

### H.  Foster's billing as a principal

Plaintiffs also point to MDOT's policy to not allow Plaintiff Foster to bill as a principal to her contracts as gender and race discrimination.  Defendants state that, for a time, MDOT did not permit principals of any consulting firm to charge directly to a contract. (Defs.' Mot. at 5, citing Judnic Dep. at 78.)

Judnic testified that, during the course of a negotiation with Plaintiff Foster, MDOT had a policy  that principals were not to charge up to a certain point of time.  (Pls.' Resp., Ex. 2, Judnic Dep. at 77.)  He also testified that he "most likely conveyed the policy." (*Id.*)

Dargin testified that he understood MDOT policy to be that a principal could bill time on a contract so long as that principal was providing services other than just being a principal. (Pls.' Resp., Ex. 6, Dargin Dep. at 42.)

Plaintiffs argue that Plaintiff Foster has never been allowed to bill her time to a contract, even after the MDOT policy changed.  (Pls.' Resp. at 34.)  They further argue that no one ever advised Plaintiff of the policy change.  (*Id.*)  Plaintiffs allege, though, that other firms' principals were allowed to bill to the contract.  (Foster Dep. at 143-44.)  She did not identify which principals were allowed.  She stated that she heard that other principals were allowed, though.  (*Id.* at 139.)

8

### I.  Steucher incident

Plaintiffs also point to an incident that occurred in 2009 when BBF submitted a proposal in response to an RFP for work in Oakland County.  Defendant Steucher testified that the project received its funding from American Recovery and Reinvestment Act funds, which resulted in an altered selection process.  (Defs.' Mot. at 7, citing Steucher Dep. at 61.)  Defendants explain that the selection team would identify the three highest scoring firms and forward those firms for a second-round evaluation.  (*Id.* at 7-8.)  Defendants state that BBF was not one of three highest scoring firms.

The selection committee included Defendant Steucher, who was the project engineer, and three other MDOT engineers: Cedric Dargin, Mark Koskinen, and Sean Kerley. (Steucher Dep. at 62.)

Dargin stated that Steucher began the meeting and then left to take a phone call. (Pls.' Resp., Ex. 6, Dargin Dep. at  78.)   While Steucher was absent, the selection committee ranked BBF number one in the rankings.  (*Id.* at 80.)  But Dargin stated that BBF did not get the contract.  (*Id.*)  He stated that BBF did not get the contract, and that BBF did not even finish in the top three of the rankings because Steucher unilaterally changed the rankings.  (*Id.* at 81.)  Dargin added that, when Steucher returned to the meeting, he saw the rankings, changed them, and stated, "I hate her," talking about Plaintiff Foster.  (*Id.*)

### J.  2010 RFP incident with vehicles

In 2010, MDOT issued another RFP with Judnic as project engineer.  This specific RFP required the consultants who wanted to submit proposals to have at least five leased vehicles.  (Defs.' Mot., Ex. 24.)  When questioned, Judnic did not answer whether the new

vehicle requirement would have a negative impact on smaller contractors, who may have lacked the ability to invest in the vehicles up front.  (Judnic Dep. at 147.)  This RFP was the only one that contained the requirement.  (*Id.* at 149.)

Plaintiff Foster stated that she had never seen this type of requirement on any RFP before.  (Foster Dep. at 132.)  She acknowledged that the RFP was posted on the MDOT website and that any firm that wanted to could submit a proposal.  (*Id.* at 134.)  Plaintiff Foster alleged that this RFP was discriminatory because it eliminated her, as a DBE, from submitting a proposal, because she did not have the five leased vehicles.  (*Id.* at 135-36.)  Plaintiff Foster stated that she did not know who wrote the RFP and included the vehicle requirement.  (*Id.* at 136-37.)  But Plaintiff Foster stated that Judnic changed the policy once HNTB, another consulting firm, received the work.  (*Id.* at 137.)

Dargin stated that he had never drafted an RFP to include a requirement that the consultant have leased vehicles.

Defendants stated that other states around the nation had required a similar leased vehicles requirement and that the requirement was an attempt at cost-saving.  But Defendants also state that the contractor and consulting community responded so unfavorably to the requirement that MDOT never again required the vehicles.

### K. Plaintiff Foster takes issue with BBF's 2008 evaluations, having to FOIA subconsultant evaluations, and meeting with Steve Griffiths for monthly meetings instead of Judnic

Plaintiffs state that they suffered discrimination because they had to FOIA, that is, file a Freedom of Information Act request, to get subcontractor evaluations for one of its projects on which it was the prime consultant.  (Foster Dep. at 119120.)  She stated that she had previously received such evaluations for her subconsultants without requesting

them.  (*Id.* at 114-117.)  She also stated that she had no evidence that Judnic refused to provide the subconsultant scores based on her race or gender.  (*Id.* at 118.)

So that Plaintiffs would not be blind-sided by an unfavorable evaluation, as with the 2008 subcontract, Plaintiff Foster stated that she requested monthly meetings with Judnic. (Foster Dep. at 119.)  But she stated that Judnic said he did not have time for the meetings, so Steve Griffiths, Judnic's engineering assistant, attended the meetings instead.  (*Id.* at 119-120.)  Plaintiff added that she sought the meetings so that she and BBF would receive high evaluation scores.  (*Id.* at 120.)  She stated that she was not aware of Judnic holding any monthly meetings with any other prime consultants and that she did not know why Judnic did not meet with her.  (*Id.* at 121.)

On June 15, 2010, Plaintiff Foster sent a letter to Tony Kratofil of MDOT relating to contract 2008-0044.  (Pls.' Resp., Ex. 7, Summary.)  In the letter, Plaintiff Foster expressed her concern about MDOT's proposal and evaluation process.  (*Id.*)  She stated that she was concerned because MDOT had rated BBF the "lowest of the entire as-needed services team on two consecutive contracts with the same project engineer manager."  (*Id.*)  Plaintiff Foster stated that she was particularly disturbed because she had requested meetings for her recent contract.  (*Id.*)  She stated, at the end of each meeting, that she asked whether MDOT management had any concerns about the work product of the team or staff.  (*Id.*)  She explained that the management never had any major issues.  (*Id.*)  She stated that she was particularly alert to the issue because the low scores would prohibit her company from securing future work. (*Id.*)

### L.  Plaintiffs state that MDOT required one of her employees to go to a recertification class

Plaintiffs allege that Defendants discriminated against her based on a technician training issue with Ray Stewart, one of Plaintiffs' employees.  (Foster Dep. at 129.)  Plaintiff Foster stated that MDOT told her that Stewart had to take a recertification class after two years, when MDOT previously told her that he only needed to recertify every five years.  (*Id.* at 129-130.)

Plaintiff Foster was not able to identify any connection between the issue and Judnic.  (Foster Dep. at 130-31.)

### M. Plaintiffs state that MDOT has subjected BBF to a discriminatory audit

Plaintiffs state that MDOT is auditing BBF and that the auditing department's sole motivation for the audit is so that MDOT can conclude that BBF and Plaintiff Foster were making too much money.  (Pls.' Resp. at 6.)

Defendants state that the Office of Commission Audit scheduled BBF as part of its annual audit plan in October, 2009.  (Defs.' Resp. at 32.)

### N. The Federal Highway Administration suggested that MDOT was discriminating against Plaintiff Foster and recommended that MDOT attempt to resolve her claims

In 2010, Plaintiff Foster filed four complaints under the Title VI Civil Rights Act against MDOT with the Federal Highway Administration Civil Rights Headquarters' Office/United States Department of Transportation (FHA).  (Pls.' Resp., Ex. 1.)  On October 18, 2011, the FHA wrote a letter to Steudle stating that it investigated four complaints (while noting that seven other complaints were untimely) and found that the investigation report "indicate[d] [that Plaintiff Foster] was not treated fairly in the procurement process by MDOT."  (*Id.*)  The FHA stated that, on September 15, 2011, it met with MDOT to discuss the investigation report and asked MDOT to consider settling Plaintiff Foster's claims.  (*Id.*)  In the October

12

18 letter, the FHA also requested that MDOT "form a process improvement team aimed at strengthening MDOT's monitoring of the consulting/service contract award process." (*Id.*)

The FHA's investigation report shows that the agency uses a "preponderance of the evidence" standard, which it defines as "just enough evidence to make it more likely than not that the fact the claimant seeks to prove is true." (Pls.' Resp., Ex. 1.) The FHA showed in its report that it found that "the preponderance of the evidence showed that an MDOT employee willfully removed BBF Engineering Services P.C. from the top place of a consulting construction award so that [Plaintiff] Foster's firm would not be considered." (*Id.*) The FHA stated in its report that "the evidence [of the investigation] shows that based on [Plaintiff] Foster's sex (gender) (female) an MDOT employee sent forward her contract to Lansing to have funds removed from it. This [act] resulted in her as-needed service contract being cut in half." (*Id.*) The FHA concluded that "[t]hese facts have raised questions in the way service/consulting contracts are awarded at MDOT and the 'power' that Project Engineers have in those selections and awards." (*Id.*)

The report of the inquiry lists several results. (Pls.' Resp., Ex. 1.) The report first gives the results of FHA's interview with Marilyn Caldwell, who had been Judnic's secretary for five years. (*Id.*) She stated that, in 2006, speaking of Plaintiff Foster, Judnic said that "[n]o woman should be making money like that." (*Id.*) The report indicates that Caldwell could not recall whether Judnic stated "no woman" or "no Black woman." (*Id.*)

The FHA then pointed out that, in June, 2006, Judnic notified BBF that MDOT was cutting the BBF "as needed" contract in half and "rebidding" the M-10 portion of the contract. (Pls.' Resp., Ex. 1.) The FHA stated that MDOT told the FHA investigator, Mary Finch, that a committee in Lansing made the decision to "unbundle" larger contracts so that

13

MDOT could create a "viable consultant industry." (*Id.*)  Mary Finch interviewed Judnic, and the report shows that he told her that, "Lansing wants to provide more opportunities for diverse small consultants[.]" (*Id.*)  Finch reported that she asked Judnic whether he considered that BBF was a Disadvantaged Business Enterprise, to which he responded, "I didn't think of that." (*Id.*)  As a result of the re-bidding, FHA noted that BBF was awarded the as-needed $2.2 million contract and the M-10 portion of the contract was awarded to Fishbeck for $2.0 million. (*Id.*)   FHA noted that, at the time of the Fishbeck award, Fishbeck was the third largest consultant doing business with MDOT. (*Id.*)   The investigator reported that BBF did not bid on the second contract, and that Mr. Frierson, of MDOT, stated that BBF should have bid on the second contract as well. (*Id.*)

The FHA also reported that MDOT attempted to reduce the service hours and services by one half of their original amount on BBF's 2008-0044 contract. (Pls.' Resp., Ex. 1.)  The report shows that, once Plaintiff Foster complained to Mr. Frierson, MDOT did not cut the services. (*Id.*)  Judnic was the project engineer supervisor on the project and Jason Voigt was the project engineer. (*Id.*)

From the investigation, the FHA concluded that the "preponderance of the evidence" showed that Judnic "appear[ed] to have taken actions based on [Plaintiff Foster's] sex (gender) (female.)" (Pls.' Resp., Ex. 1.)  The FHA reasoned that there was a connection between Judnic's "women" statement and then how he acted later on BBF's contracts to "suggest" that the contracts "go forward as contracts that could be cut" later on. (*Id.*)

The FHA also concluded that the MDOT offices in Lansing were sending mixed messages about what it wanted to accomplish by re-advertising parts of contracts. (Pls.' Resp., Ex. 1.)  The FHA stated that the evidence showed that Judnic "thought he was

14

supposed to be obtaining more diversity in his contracting opportunities and he cho[se] to break out [of] a contract that was already awarded to a DBE." (*Id.*)  The FHA pointed out that "[t]he result was that a large white[-]owned firm was awarded the second half of the contract. (*Id.*)

The FHA finally noted an incident in which Steucher "willfully changed the scores on [a bidding sheet] to remove BBF Engineering from the top three so the firm would not be considered [in a contract bidding approval meeting]." (Pls.' Resp., Ex. 1.)  The FHA stated that it did not discover Steucher's motive in decreasing the score. (*Id.*)  But the FHA explained that, in the MDOT contract-awarding process, the project engineers usually lead the consultant selection teams, which also usually contain a majority of people who work for the project engineer. (*Id.*)  The FHA reasoned that the project engineer "could" bias the team in the scoring. (*Id.*)  The FHA concluded that the "consultation selection process[,] although non-discriminatory on its face[,] resulted in disparate treatment to [Plaintiff] Foster." (*Id.*)

The FHA recommended that MDOT "should set up a process improvement team aimed at strengthening MDOT's monitoring of the consulting/service contract award process." (Pls.' Resp., Ex. 1.)  The FHA also recommended that MDOT meet with Plaintiff Foster about her claims and attempt to settle them in a way that both parties would find acceptable. (*Id.*)

### O. Plaintiffs' miscellaneous allegations

From 1999 to the date of the summary, BBF had 30 contracts as prime consultant, 39 including revisions/amendments. (Pls.' Resp., Ex. 7, Summary.)  The total for the contracts

15

was $15,618,544.53. (*Id.*) The summary notes that BBF was a subconsultant on 23 contracts, totaling $1,829,108.20. (*Id.*)

From 2006 to the date of the summary, BBF proposed on 35 projects as a prime consultant. (Pls.' Resp., Ex. 7, Summary.) The summary notes that eight out of thirty-five projects were Tier One projects. (*Id.*) BBF was selected for one of the eight Tier One projects. (*Id.*) Of the remaining twenty-six projects, BBF was selected for four projects. (*Id.*) Of the remaining twenty-two, six of those projects were awarded to DBEs. (*Id.*)

At her deposition, defense counsel asked Plaintiff Foster to point to facts or reasons she believed that MDOT, through Defendants Judnic and Steucher, discriminated against her based on her gender and race. (Foster Dep. at 60-61.) Plaintiff Foster stated that, if she had to pick race or gender, she would say race, because she knew several white-owned female firms had more work than they could handle. (*Id.* at 60-61.) She stated that race was the only thing left. (*Id.*) But she added that she did believe both race and gender played a part in her not receiving more work from MDOT. (*Id.* at 61.)

## II.  Rule 56 summary judgment standard of review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Revised Rule 56 expressly provides that:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to properly support or address a fact:

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or

(4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, drawing "all justifiable inferences in the light most favorable to the non-moving party."  *Hager v. Pike Cnty. Bd. Of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.  Relevant analytical background

17

In the Court's February 6, 2012 order, the Court addressed Defendant Judnic's statute of limitations argument.  (Dkt. 21, February 6, 2012 Order.)  The Court held that Plaintiffs "did not exercise due diligence in a timely manner and cannot [] assert claims for actions that occurred more than three years ago."  (February 6, 2012 Order at 16.)  The Court rejected Plaintiffs' equitable tolling argument.  (*Id.*)

The Court reasoned,

> [a]lthough Plaintiffs did not know about Defendant Judnic's statement, they knew that Defendant MDOT was trying to diversify its contractors, that the 2006 contract originally awarded to Plaintiffs was cut, and that half the original contract was awarded to a majority firm.  Courts have consistently held that lacking knowledge of the discriminatory motive is not enough where Plaintiffs knew all the essential facts constituting discriminatory treatment.

(February 6, 2012 Order at 17.)  The Court then held "that Plaintiffs' allegations against Defendant Judnic before November 3, 2008 are barred by the statute of limitations."  (*Id.*)  But the Court held that Plaintiffs' complaint did state a cause of action.  (*Id.* at 18.)  The Court stated that Plaintiffs alleged that, in September, 2009, Plaintiff BBF lost the bid on a contract because its score sheet indicated that it was "missing key MDOT staff" and that Defendant Judnic refused to meet with Plaintiffs to explain the scoring and refused to conduct debriefing meetings with Plaintiffs in person, although he did them for other consultants.  (*Id.*)   The Court also stated that Plaintiffs' claim could proceed because Plaintiffs alleged that Defendant Judnic  "engaged in an orchestrated scheme to remove Plaintiff BBF's employee, Love Charles, in order to create a negative impact on Plaintiffs' ability to compete."  (*Id.*)  While the Court held that Plaintiffs could not collect damages for the 2006 contract, the Court did find that it could use Defendant Judnic's "no women"

statement to shed light on and further inform the motives he had when treating Plaintiffs differently than other contractors." (*Id.* at 18-19.)

After the February 6, 2012 order, the surviving claims were (1) § 1983 gender-discrimination claims against Defendants Judnic and Steucher and (2) WPA claims against Defendants Judnic and Steucher.

On June 7, 2012, the Court granted in part Plaintiffs' motion to amend the complaint. (Dkt. 35.)  The Court allowed "the inclusion of Count I for racial and other discrimination under the Equal Protection Clause of the Fourteenth Amendment against . . . Judnic and Steucher.' (*Id.*)

On August 22, 2012, the Court granted another motion to amend.  (Dkt. 41.)  The Court allowed Plaintiffs to substitute the Governor Snyder and MDOT Director Steudle, in their official capacities, for State of Michigan and MDOT.  (August 22, 2012 Order at 5.) The Court permitted the amendment against Snyder and Steudle insofar as Plaintiffs sought "prospective injunctive relief against those Defendants."  (*Id.* at 8.)

## IV.   Analysis[2]

---

[2]Defendants argue that, the Court, in its February 6, 2012 order, held that the three-year statute of limitations claims for § 1983 claims barred all of Plaintiffs' claims that accrued before November 3, 2008.  (Defs.' Mot. at 13.)  "For civil rights suits filed in Michigan under § 1983, the statute of limitations is three years."  *Otworth v. Vanderploeg*, 61 F. App'x 163, 165 (6th Cir. 2003) (citing Mich. Comp. Laws § 600.5805(8) and *Carroll v. Wilkerson*, 782 F.2d 44, 45 (6th Cir. 1986)).  Plaintiffs acknowledge the Court's February 6, 2012 statute of limitations holding and state that they "respect" it.  (Pls.' Resp. at 11.)  But they argue that the Court may look at the evidence of those actions Defendants took before November 3, 2008.  (*Id.* at 12.)   The Court has reviewed the entire record and agrees with Defendants--Plaintiff cannot recover for any alleged constitutional violations Defendants took before November 3, 2008.  But the Court also notes that it may review the record to shed light on post-November 3, 2008 actions.  Regardless of what evidence the Court

Although Defendants assert various procedural arguments in the beginning of their motion, to which Plaintiffs respond, the Court skips to the discrimination arguments. For if Plaintiffs' § 1983 discrimination claims do not survive summary judgment on the claims' merits, then the constructive notice issue, the statute of limitations arguments, and the claims against Defendants Snyder and Steudle are rendered moot.

Because the Court finds that Plaintiffs have not brought forth direct evidence of race or gender discrimination and have also failed to establish a prima facie case of discrimination with circumstantial evidence against Judnic and Steucher, the Court grants Defendants' motion for summary judgment with respect to those claims and the claims dependent upon them.

The Court also finds that Plaintiffs cannot substantiate, even if they raised, a class-of-one equal protection claim under Sixth Circuit precedent.

The Court then addresses Plaintiffs' WPA claim. Because the Court finds that the WPA statute of limitations bars Plaintiffs' claims, that the WPA does not apply to Plaintiffs because they are independent contractors, and because Plaintiffs' have failed to show that they suffered an adverse action stemming from her filing her Title VI complaints, the Court grants Defendants' motion for summary judgment with respect to Plaintiffs' WPA claims as well.

## A.  The Equal Protection Clause

---

views, though, as the Court explains below, Plaintiffs have not brought forth sufficient evidence of race or sex discrimination.

"The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Rondigo, L.L.C. v Township of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011) (citation omitted).

"In order to establish an equal protection violation against a public employer in a [§] 1983 action, a plaintiff must show that the employer made an adverse employment decision 'with a discriminatory intent and purpose.'" *Boger v. Wayne Cnty.*, 950 F.2d 316, 324-25 (6th Cir. 1991) (citations omitted). "[A] plaintiff in a section 1983 equal protection case must do more than just introduce evidence of discriminatory intent and suggest that 'such intent could have played a role in an adverse employment decision. Rather, a plaintiff is required to demonstrate that the adverse employment decision would not have been made 'but for' her [protected status.]" *Id.* at 325 (citation omitted).

As an African-American woman, Plaintiff Foster is a member of a protected class for race and gender. *Oliver v. St. Luke's Dialysis LLC*, 491 F.App'x 586, 587 (6th Cir. 2012) (citations omitted). She therefore must bring forth evidence that Defendants discriminated against her based on her protected class to survive summary judgment if she expects to succeed on a suspect class Equal Protection discrimination claim.

### B.  The qualified immunity doctrine

As government officials, Defendants Judnic and Steucher allege that they are entitled to qualified immunity for the actions they allegedly took because they did not violate Plaintiffs' constitutional rights.

21

"The qualified-immunity doctrine shields government officials performing discretionary functions from civil liability unless their conduct violates clearly established rights." *Yoder v. University of Louisville*, 12-5354, 2013 WL 1976515, at *6 (6th Cir. May 15, 2013) (citation omitted). "Qualified immunity balances two important interests–the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* (citation omitted). "The doctrine focuses on 'the objective reasonableness of an official's conduct, as measured by reference to clearly established law' to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'" *Id.* (citations omitted).

Courts conduct a two-step inquiry in determining whether qualified immunity applies: (1) whether, considering the allegations in a light most favorable to the injured party, a constitutional right has been violated and (2) whether that right was clearly established. *Id.* (quotation marks and citations omitted). Courts may address either step first. *Id.* (citation omitted).

## C. Plaintiffs have not brought forth direct evidence of gender or race discrimination by Judnic or Steucher

The Sixth Circuit defines "direct evidence" as "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Schweitzer v. Teamster Local 100*, 413 F.3d 533, 537 (6th Cir. 2005) (citation omitted). Put another way, "direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment

22

action was motivated at least in part by prejudice against members of the protected group."
*Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 913-14 (6th Cir. 2013)
(citation omitted).

In their response, Plaintiffs suggest various facts that they believe are direct evidence
of gender or race discrimination.  The Court addresses each suggestion, in turn, and
ultimately finds that Plaintiffs have not offered direct evidence of discrimination.

### 1.  Plaintiffs' offered email is not direct of evidence of discrimination

Plaintiffs first argue that MDOT employees recognized the viability of Plaintiffs' Title
VI claims.  (Pls.' Resp. at 17.)  Plaintiffs offer Pat Collins's email as direct evidence.  In this
email, Collins sends Plaintiff Foster a link to a Title VI webpage and suggests that Plaintiff
Foster take a look at the website.  (Pls.' Resp., Ex. 8.)  Collins also states that she has
been following Plaintiff Foster's concerns with "delayed payments and issues with some of
[her] staff on MDOT projects, as well as other issues."  (*Id.*)

This email is not direct evidence of race or gender discrimination.  The Court must
draw too many inferences from the statement for the Court to consider it direct evidence.
Here, with this email, the Court lacks the who, where, what, how, and why.  Nothing in the
statements made references race or gender discrimination.  It is not direct evidence.

### 2.  The prior MDOT complaints against Judnic are not direct evidence of race or gender discrimination

Plaintiffs next argue that a former complaint against Judnic in 2008 is direct evidence
of discrimination.  (Pls.' Resp. at 17.)  This complaint has nothing to do with race or gender.

23

(Pls.' Resp., Ex. 15.)  This complaint additionally does not prove that any discrimination claim panned out, for MDOT did not find that the complainant's allegations had merit.

This former complaint requires the Court to again make inferences, it is not direct evidence of discrimination.

### 3. Allegations of more favorable treatment to other firms is not direct evidence of discrimination

Plaintiffs argue that two firms receiving more favorable contract bidding treatment from MDOT is direct evidence of discrimination.  (Pls.' Resp. at 17.)  The Court cannot agree–this evidence is more suited to a circumstantial evidence inquiry and addresses the argument below.

### 4. The FHA's report of inquiry is not direct evidence of discrimination

Plaintiffs offer the FHA's report as direct evidence of discrimination.  (Pls.' Resp. at 18.)  The report is not direct evidence of discrimination.  While the report does come to the conclusion that Judnic may have discriminated against Plaintiff Foster based on her gender, the Court cannot so easily take the report's suggestion and apply it here.  The Court first disagrees that MDOT generally treating Plaintiffs unfairly provides an actionable race or gender claim.  Save for Judnic's statement about a woman making too much money, no other statement strongly links the actions MDOT allegedly took towards Plaintiff Foster with the fact that she is a woman or an African American.  And, as the Court discusses below, the Judnic statement itself is not direct evidence of discrimination.  The report is not direct evidence, it requires the Court to draw inferences into the thoroughness and truthfulness of the interviewer and the statements made within the report.  The Court

24

follows the proofs of race and gender discrimination claims as set forth by the Supreme Court and the Sixth Circuit, not by the FHA. The Court therefore cannot take this report as direct evidence of discrimination.

### 5. Judnic's statement is not direct evidence of race or gender discrimination

Judnic's statement, that "no woman should be making that kind of money" is not direct evidence. As Defendants argue, there is no definite indication that Judnic was talking about Plaintiff. While Caldwell stated that she was not aware of any other woman working for MDOT at the time, that unawareness is not sufficient to be direct evidence. The statement is also not direct evidence because it does not give an indication that allows the Court to conclude that he took the alleged actions against Plaintiff Foster, the failure to award contracts and the reducing of contract awards, based upon Plaintiff Foster's race or gender. *See Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012) (stating that statements that do not reference a plaintiff are not direct evidence of discrimination against that plaintiff, but can be circumstantial evidence of a discrimination against that plaintiff. And quoting that "[c]ircumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff.") (citation omitted).

### 6. MDOT's rejections of BBF's proposals are not direct evidence of discrimination

Plaintiffs allege that, between 2007 and 2011, MDOT rejected over 29 projects for which BBF submitted proposals. (Pls.' Resp. at 19.) They argue that these rejections are

25

direct evidence of race or gender discrimination.  (*Id.*)  The Court disagrees.  The Court acknowledges that Plaintiffs have offered the fact that BBF was awarded 2008 MDOT contractor of the year, but that fact, alone, does not entitle them to win every contract for which they submit a proposal.  This evidence requires too many inferences for it to be direct evidence.  For example, the Court does not know the situations surrounding these 29 other projects or which other contractors submitted proposals.  These situations also do not show that Judnic, Steucher, or any of the Defendants deliberately awarded the contracts to other contractors because of a racial or gender bias against Plaintiff Foster.

### 7.  MDOT's alleged own admissions are not direct evidence of discrimination

Plaintiffs next allege that an MDOT employee stated that "[t]he two folks identified as culpable in this incident have both left the department.  I have a team . . . to address internal and external concerns with the existing process."  (Pls.' Resp. at 19, Ex. 20.)  Plaintiffs also allege that Steudle's statement to MDOT to "revamp" the "consultant selection process again" is direct evidence of discrimination.  Nothing in these statements references Plaintiff Foster and nothing in these statement implies racial or gender discrimination in MDOT generally or toward Plaintiff Foster specifically.  And again, the fact that MDOT saw a need to correct the consultant selection process is not direct evidence of race or gender discrimination.

### 8.  Steucher's statement is not direct evidence of discrimination

Plaintiffs also maintain that Steucher's statement about Plaintiff Foster and his unilateral changing of BBF's evaluation scores is direct evidence of discrimination.  Such

evidence is not direct evidence of discrimination.  Here, while Steucher allegedly expressed hatred towards Plaintiff Foster, by saying "I hate her," and changing BBF's score, the statement does not address Plaintiff's race or gender.  Plaintiffs argue that "her" directly references discriminatory intent against Plaintiff Foster's gender.  The Court disagrees. "Her" is a simple pronoun that stands in place for "Bellandra Foster."  Even the hate comment coupled with the reducing of BBF's evaluation is not direct evidence of race or gender discrimination.  The Court has to infer that Steucher hated Plaintiff Foster and took actions against her because she is a woman or because she is an African American.  And here, Plaintiffs have not presented evidence that Steucher hated Plaintiff because she was a woman or an African American, such evidence is therefore not direct evidence.  "[T]o the extent that [Plaintiff] asserts that [Steucher] was motivated by personal animus towards her, this [animus] does not give rise to an inference of unlawful discrimination."  *Miller v. CVS Pharmacy, Inc.*, 779 F.Supp.2d 683, 694, n. 5 (E.D.Mich. 2001) (Rosen, C.J.) (citation omitted).  *See also Hall v. Sky Chefs, Inc.*, 784 F.Supp.2d 811, 825, n. 17 (E.D.Mich. 2011) (Rosen, C.J.) ("[P]ersonal animus directed at [a plaintiff] individually is not indicative of discrimination based on membership in a protected class.").

### D. Plaintiffs have not put forth a prima facie case of discrimination with circumstantial evidence

Circumstantial evidence "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred."  *Wexler*, 317 F.3d at 570 (citation omitted).

Where a plaintiff uses circumstantial evidence to prove her claim, the Court analyzes the claim using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If the plaintiff puts forth a prima face case of discrimination, then the defendant must "articulate some legitimate, nondiscriminatory reason" for the termination. *Id.* (citation omitted). If the defendant does so, "then the burden of production shifts back to the plaintiff to demonstrate that the proffered reason is a pretext." *Id.* (citation omitted).

Both parties analyze Plaintiffs' circumstantial evidence arguments under the single-motive burden-shifting framework. To establish a prima facie case of discrimination, then, Plaintiff must show: (1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) different treatment of a similarly-situated nonprotected person. *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) (discussing race discrimination) (citation omitted). *See Warf v. U.S. Dept. of Veterans Affairs*, 713 F.3d 874, 879 (6th Cir. 2013) (listing similar elements for a gender discrimination prima facie prima facie case.).

If a plaintiff establishes a prima facie case of discrimination "the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions." *Kuhn*, 709 F.3d at 624 (citations omitted). If the employer makes that showing, then the plaintiff has the burden to show "that the proffered reason was not the true reason for the employment decision . . . but was instead a pretext designed to mask unlawful discrimination." *Id.* (citations omitted).

The plaintiff "can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was

28

insufficient to warrant the challenged conduct." *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 915 (6th Cir. 2013) (citations omitted).  The Sixth Circuit "has adopted an approach that requires an employer, to avoid a finding that its claimed nondiscriminatory reason was pretextual, 'to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.'" *Id.* (citations omitted).  The "key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment act." *Id.* (citations omitted).

### 1. Plaintiffs are in a protected class

Defendants do not dispute that Plaintiff Foster was in a protected class for her race and gender.  Nor do Defendants dispute that Plaintiff Foster was qualified for the position in question.  Plaintiffs, therefore, to establish a prima facie case of discrimination, must show that she suffered an adverse action and that Judnic and Steucher treated a nonprotected person who was similarly-situated more favorably.

### 2. For the purposes of summary judgment, Plaintiffs have suffered an adverse action from Judnic and Steucher

An adverse action is material if it would dissuade a reasonable worker from making or supporting a charge of discrimination. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 290 (6th Cir. 2012) (citations and quotation marks omitted).

### A. Judnic took an adverse action against Plaintiff when he gave BBF low evaluation scores

Defendants argue that having Plaintiff Foster have to request FOIA records, not getting paid for the Gateway Project when URS was not submitting BBF's invoices, BBF's

29

low evaluation scores, failure to hold face-to-face debriefing meetings, Griffith's attending the monthly meetings instead of Judnic, the 2010 RFP vehicle requirement, the office technician training, and the principal billing issues are not adverse actions.

Plaintiff Foster, though, has stated that the low scores negatively and significantly affected her ability to attain work, and that, a score differential of .5 was enough to not be in the top ranked firms for a project.  For the purposes of summary judgment, then, the Court finds that Plaintiffs' alleged negative evaluations were an adverse action for the purpose of a prima facie case.  *See Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 290 (6th Cir. 2012) (holding that a negative employment evaluation generally does not rise to the level of dissuading a reasonable worker from making or supporting a charge of discrimination unless the evaluation significantly impacts an employee's wages or professional advancement.).

### B. Steucher took an adverse action against Plaintiffs when he arbitrarily changed Plaintiffs' evaluation scores, effectively taking Plaintiffs out of contention for securing a project

Just as the Court found that Plaintiffs have brought forth facts that Judnic took an adverse action against Plaintiffs by giving Plaintiffs low evaluation scores, the Court finds that, for the purposes of summary judgment, Plaintiffs have offered an adverse action as to Steucher when he changed the scores on a BBF evaluation, taking it out of consideration for an MDOT project.

### 3. Plaintiffs fail to establish that Judnic or Steucher treated a nonprotected similarly-situated person or entity different

For a plaintiff to show that she was treated differently than similarly-situated males or nonprotected class women for the same or similar conduct, she must show that "all relevant aspects" of her employment situation are "nearly identical" to those of the allegedly similarly-situated persons. *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004) (quotation marks and citations omitted)(gender); *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339 (6th Cir. 2012) (race). The males or nonprotected class women must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Id.* (quotation marks and citations omitted).

Plaintiffs offer two instances of MDOT treating other firms differently. (Pls.' Resp. at 17-18.) Plaintiffs first argue that Wade Trim Associates, a non-minority firm, received different, more favorable, treatment from MDOT. (*Id.* at 17.) Plaintiffs state that MDOT's Central Sections Review Team, in January, 2008, approved Wade Trim's "[proposal] for full construction engineering services on [various] routes in the [metro Detroit] region." (*Id.* at 17-18.) Plaintiffs allege that Wade Trim was not qualified, because it failed to have the necessary prequalifications. (*Id.* at 18.) Plaintiffs further allege that MDOT assisted Wade Trim by modifying the standards. (*Id.*, Pls.' Resp., Ex. 16.) Plaintiffs then point to Great Lakes Engineering, a white female-owned firm. (*Id.*, Pls.' Resp. at 18.) Plaintiffs state that HNTB, a consulting firm, "rejected BBF's overtures in favor of a white female owned firm." (*Id.*) Plaintiffs add that "MDOT and consultant project engineers orchestrated an entire plan to supply Great Lakes Engineering with inspection staff." (*Id.*)

31

Plaintiffs have not brought forth evidence that satisfies the similarly-situated element of a prima facie case of discrimination.  Plaintiffs have not offered evidence that Wade Trim or Great Lakes dealt with the same supervisors as Plaintiffs, were of the same size as Plaintiffs, offered substantially similar proposals to MDOT, had substantially similar teams of employees, or substantially similar evaluations or scores going into the proposals. Because of this failure to bring forth evidence, Plaintiffs have not satisfied the third element of a prima facie case and their discrimination claims fail.

### E.  Plaintiffs' class-of-one Equal Protection claim fails

The parties dispute whether Plaintiffs have asserted a class-of-one Equal Protection claim.  The first mention of any class-of-one claim appeared in Defendants' motion for summary judgment.  (Defs.' Mot. at 36.)  Defendants stated, briefly, that Plaintiffs were alleging that Defendants were treating them differently than all other companies, cognizable as a "class-of-one" claim.  (*Id.*)  Plaintiffs responded to the class-of-one issue and stated that they "premise all of their claims on *per se* suspect classifications, both race and sex." (Pls.' Resp. at 40.)  They added that the suspect classification claims took them out of the context that Defendants were arguing.  (*Id.*)

The Court found that the class-of-one claim was not fully fleshed out and ordered supplemental briefing, which the Court discusses below.  (Dkt. 64.)  Both parties submitted briefs on the issue.  (Dkt. 65, 66.)

A plaintiff can bring a class-of-one Equal Protection claim when she "alleges that the state treated [her] differently from others similarly situated and that there is no rational basis for such difference in treatment."  *Warren v. City of Athens, Ohio*, 411 F.3d 697, 710 (6th

32

Cir. 2005) (citation omitted). "The 'rational basis' test means that courts will not overturn government action 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [government's] actions were irrational." *Id.* at 710-11 (citations omitted, insertions in *Warren.*). "A 'class of one' plaintiff may demonstrate that a government action lacks a rational basis in one of two ways; either by 'negativ[ing] every conceivable basis which might support' the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Warren v. City of Athens, Ohio*, 411 F.3d 697, 711 (6th Cir. 2005) (citations omitted, insertion in *Warren.*).

The Supreme Court, though, has limited the class-of-one Equal Protection claim in the public employment context. *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591 (2008). In *Engquist*, the Supreme Court found that the public employment situation was different from the class-of-one theory put forth in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). The Court stated that, in *Olech*, the plaintiff/property owner sought to connect her property to the municipal water supply. *Engquist*, 533 U.S. at 601. The defendant village sought a 33-foot easement on the plaintiff's property, when previously, it had only sought 18-foot easements for that connection. *Id.* The plaintiff sued and the Court allowed the plaintiff's class-of-one Equal Protection claim to proceed. *Id.* The Court held that the plaintiff had stated a valid claim under the Equal Protection Clause because she alleged that she had been "intentionally treated differently from others similarly situated and that there [was] no rational basis for the difference in treatment." *Id.* The Court noted that the Equal Protection Clause required at least a rational reason for different treatment of similarly-

situated persons. *Id.* at 602. In *Olech*, the Court noted, the plaintiff had alleged that the defendant did not give a rational reason for the differential treatment and that allegation implicated Equal Protection issues. *Id.* The Court further noted, though, that "[w]hat seems to have been significant in *Olech* and the cases on which it relied was the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed." *Id.*

The Court reasoned that not all cases presented a clear standard of state action. *Engquist*, 553 U.S. at 603. The Court stated

> [t]here are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

*Id.* The Court explained that "[i]t is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized." *Id.* at 604. Given that principle, the Court held that the class-of-one theory of Equal Protection"–which presupposed that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rational review–is simply a poor fit in the public employment context." *Id.* at 605. The Court found that treating employees differently is not classifying "them in a way that raises equal protection concerns." *Id.* "Rather, [that treatment] is simply to exercise the broad discretion that typically characterizes the employer-employee relationship." *Id.* The Court held that that type of

challenge "is a challenge to the underlying nature of the government action." *Id.* The Court further held that it would not ratify a class-of-one theory of Equal Protection in the public employment context because it would impermissibly "constitutionalize the employee grievance." *Id.* at 609. The Court stated that "[t]he federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." *Id.* (citation omitted).

Defendants argue that *Engquist* bars Plaintiffs' class-of-one Equal Protection claim. (Defs.' Mot. at 36.) They state that courts have had little trouble applying *Engquist* to the public contracting context. (*Id.*) Defendants point to *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269 (11th Cir. 2008) to support their position.

In *Douglas*, the plaintiffs, a highway paving contractor company and its principals and owners, alleged a class-of-one Equal Protection claim against the Georgia Department of Transportation (GDOT) and various GDOT officials. 541 F.3d at 1271. The plaintiffs alleged that the defendants treated them differently"than all other paving contractors" and violated the Equal Protection Clause in doing so. *Id.* While the district court found merit in the plaintiffs' class-of-one claim, the Eleventh Circuit disagreed, stating that the plaintiffs' claim was "not legally cognizable under the circumstances," "and because [the plaintiff principal] failed to adequately allege a similarly situated comparator[.]" *Id.* The Eleventh Circuit relied upon *Engquist* in making its decision. *Id.* The court held

> [j]ust as in the employee context, and in the absence of a restricting contract or statute, decisions involving government contractors require broad discretion that may rest "on a wide array of factors that are difficult to articulate and quantify." We hold, therefore, that *Engquist* controls this case and makes clear that [the plaintiff principal] failed to assert a cognizable right to equal protection.

*Id.* at 1274 (citations omitted).    The *Douglas* court also found that the plaintiffs' Equal Protection claim failed because they failed to bring forth evidence of similarly-situated contractors, a requirement the court noted, the Eleventh Circuit applied "with rigor."  *Id.* at 1275 (citation omitted).

Upon its own research, this Court asked the parties to brief the Seventh Circuit's recent opinion, *Swanson v. City of Chetek*, ---F.3d---, 2013 WL 3018926 (7th Cir. June 19, 2013).  There, the Seventh Circuit dealt with a situation in which a plaintiff alleged a class-of-one Equal Protection claim but was not able bring forth a similarly-situated individual. *Swanson*, 2013 WL 3018926, at *1.  The Seventh Circuit allowed the plaintiff's case to survive summary judgment because the plaintiff was able to put forth a strong showing of animus.  *Id.*  The court held that "animus is the very basis of a class-of-one claim[.]"  *Id.*

There, the plaintiff was a homeowner who purchased lakeside property next to the defendant city's mayor.  *Swanson*, 2013 WL 3018926, at *1.  The plaintiff decided to remodel his home and obtained the proper permits.  *Id.*  The mayor did not like the situation and so used his official power to harass the plaintiff in the remodeling process.  *Id.*  The court noted that the harassment included: interfering with the obtaining of the building permits; entering the plaintiff's home without permission; using his influence to delay the remodeling; and causing the defendant city's prosecution of the plaintiff in municipal court for violating a five-foot setback requirement.  *Id.*  The Seventh Circuit noted that the municipal case was without merit.  *Id.*

The plaintiff filed a class-of-one Equal Protection claim.  *Swanson*, 2013 WL 3018926, at *1.  At the trial level, the magistrate judge granted summary judgment because the

plaintiff failed to put forth a similarly-situated individual who received more favorable treatment.  *Id.*

The Seventh Circuit reversed, holding "that a clear showing of animus, absent a robust comparison to a similarly situated individual, may sustain a class-of-one equal protection claim[.]"  *Swanson*, 2013 WL 3018926, at *2.  The court began its analysis by giving an example of the "classic class-of-one claim," "when a public official, 'with no conceivable basis for his action other than spite or some other improper motive . . . comes down hard on a hapless private citizen.'"  *Id.* at *3 (citation omitted).  The court reasoned that the improper motive is "usually covert, so courts first look to eliminate all proper motives."  *Id.*  "If there was no rational basis for the treatment of the plaintiff, then the motives must be irrational and improper."  *Id.* (citation omitted).  The court then explained that courts usually "look to the treatment of similarly situated individuals" to achieve clarity in the analysis.  *Id.*   The court noted that, "[i]n most class-of-one cases, the comparison of similarly situated individuals will be used to infer animus."  *Id.*  But the court stated that the case before it was the exact opposite of a 'normal' class-of-one case—for the animus was "easily demonstrated."  *Id.*   The Seventh Circuit held that, "[i]f animus is readily obvious, it seems redundant to require that the plaintiff show disparate treatment in a near exact, one-to-one comparison to another individual."  *Id.* at *4.  The court reasoned that the plaintiff, who showed a specific harasser, provided a plausible motive, and detailed a series of alleged actions that appeared illegitimate on their face, demonstrated animus.  *Id.*  Given the strong showing of animus, the court held that the plaintiff's offer of a similarly-situated

person (whom the trial court held was not similarly-situated in all relevant aspects) was simply helpful, but not required.  *Id*.

The Court finds that Plaintiffs cannot assert a class-of-one claim because Plaintiffs have never alleged a class-of-one claim and because, unlike *Swanson*, Sixth Circuit precedent requires the Court to identify similarly-situated persons for a plaintiff to survive summary judgment on such a claim.

In their supplemental brief, Defendants allege that Plaintiffs did not plead a class-of-one claim/they waived any such claim, that a class-of-one claim is not available in the government contracting context, and that *Swanson* conflicts with binding Sixth Circuit precedent.  (Defs.' Supplemental Br.)

Plaintiffs' supplemental brief does not add much.  (Pls.' Supplemental Br.)  Plaintiffs reassert and reallege the facts in their response to the motion for summary judgment.

Plaintiffs have not asserted a class-of-one claim.  Plaintiffs state that they countered Defendants' argument as to the class-of-one claim in their response.  (Pls.' Br. at 4.)  They argue, therefore, that they did not waive the class-of-one argument.  (*Id*.)  But Plaintiffs do not assert that they ever alleged a class-of-one claim.  The Court finds that no class-of-one claims exists at this juncture, nor have Plaintiffs requested to amend their complaint to assert such a claim.  Plaintiffs additionally continue to assert that they are basing their claims on race and sex discrimination and that they can prove prima facie cases of disparate treatment and disparate impact.  (*Id*. at 6.)

Even if they requested to amend their claim, the Court would have to deny that claim.  In the Sixth Circuit, as Defendants point out, a plaintiff alleging a class-of-one claim must

assert that she was treated differently than similarly-situated person.  *See Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 986-87 (6th Cir. 2012) ("To succeed on a 'class of one' equal protection claim, [a p]laintiff must first prove that it has been treated differently from similarly situated individuals." "To satisfy this threshold inquiry, [a plaintiff] must allege that it and other individuals who were treated differently were similarly situated in all material respects." "In determining whether individuals are 'similarly situated,' a court should 'not demand exact correlation, but should instead seek relevant similarity.'")(all citations omitted, first insertion in *Billboard*.).  Plaintiffs have not met their burden, under Sixth Circuit precedent, to offer similarly-situated individuals in all material aspects.  Their class-of-one claim fails because of this failure of proof.

The Court pauses, though, to note the problems it finds with Defendants' argument that *Swanson* is not enlightening and that *Engquist* and its progeny are an absolute bar to any claim of a contractor against a government entity.  *Swanson* stands for the proposition that animus is the key to an Equal Protection claim.  Here, Plaintiffs have alleged a non-time-barred incident motivated by animus, Steucher's comment that he hated Plaintiff Foster while unilaterally changing BBF's evaluation scores.  Under *Swanson*, Plaintiffs' claim would have a chance to survive summary judgment.  For Steucher took an arguably universal standard, the evaluation sheet, and, through animus, changed Plaintiffs' scores.  But the Court finds that the parties have not fully established whether MDOT's contract process, at the relevant stage, is an inherently discretionary action to which *Engquist* would apply.  The record also fails to establish that they would be entitled to relief under *Swanson*.

Because Plaintiffs have not alleged, or requested to allege, a class-of-one claim, the Sixth Circuit requires Plaintiffs to show similarly-situated individuals, and Plaintiffs have failed to show that Steucher's actions should not be afforded *Engquist* discretion, the Court finds that any class-of-one claim alleged fails.

**F.   Because the Court finds that Plaintiffs have not satisfied the requirements for either a direct or circumstantial evidence discrimination cause of action, or a class-of-one claim of discrimination, the Court finds that the service issues, statute of limitations issues, and the claims against Snyder and Steudle are rendered moot**

As the Court has not found that Plaintiff has established a constitutional violation, the Court finds that it need not address the service or statute of limitations arguments.  The Court additionally need not address the claims against Snyder and Steudle.  *See Floyd v. County of Keny*, 454 F.App'x 493, 498-99 (6th Cir. 2012) ("A federal court may impose prospective declaratory relief to compel a State official to comply with federal law 'regardless of whether compliance might have an ancillary effect on the state treasury[.]'" "The state official sued, however, must have, by virtue of the office, some connection with the alleged unconstitutional act or conduct of which the plaintiff complains.").  The Court therefore GRANTS Defendants' motion for summary judgment with respect to these claims.

**G.   Plaintiffs cannot, and have not, alleged a Whistleblowers' Protection Act claim**

Plaintiffs argue that Defendants' actions constituted a violation of the Michigan Whistleblowers' Protection Act (WPA), Mich. Comp. Laws § 15.361 et seq.  Plaintiffs argue that Defendants systematically retaliated against Plaintiffs because of her complaints about the alleged discrimination and disparate treatment.  Defendants argue that they are entitled

40

to summary judgment because the WPA 90-day statute of limitations bars Plaintiffs' claims, the WPA does not apply to Plaintiffs because they are independent contractors and not employees as contemplated by the statute, and because Plaintiffs have substantively failed to bring forth evidence to establish the elements of a WPA claim.

The WPA provides a remedy for an employee who suffers retaliation for reporting or planning to report a suspected violation of a law, regulation, or rule to a public body. *Anzaldua v. Neogen Corp.*, 808 N.W.2d 804, 807 (Mich.Ct.App. 2011) (citing Mich.Comp.Laws § 15.363).

### 1. The WPA's 90-day statute of limitation bars Plaintiffs' claim

The WPA has a 90-day statute of limitations. *Anzaldua*, 808 N.W. 2d at 808 (citing Mich.Comp.Laws § 15.363(1)). "In determining whether a statute of limitations applies, [a court] looks to the true nature of the complaint, reading the complaint as a whole and looking beyond the parties' labels to determine the exact nature of the claim." *Id.* (citation omitted). The statute of limitations accrues when the employer commits the wrongful act, not when she suffered the damage. *Joliet v. Pitoniak*, 715 N.W.2d 60, 67-68 (Mich. 2006).

Defendants point out that Plaintiffs filed their claim on November 3, 2011. (Defs.' Mot. at 39.) As a result, Defendants state that "a timely WPA claim would have accrued on or after August 3, 2011. (*Id.*) Defendants then point out that Judnic left MDOT in March, 2011 and that Steucher retired in December, 2010. (*Id.* at 39-40, citing Judnic Dep. at 8-9 and Steucher Dep. at 23-25.) Defendants add that neither were employees after August 3, 2011. (*Id.* at 40.) Defendants additionally point out that Plaintiffs have not identified an adverse action during the relevant time period. (*Id.*)

41

Plaintiffs argue that Defendants have not specifically pleaded statute of limitations as an affirmative defense.

The Court agrees with Defendants–"[a]n affirmative defense may be pleaded in general terms and will be held to be sufficient . . . as long as it gives plaintiff fair notice of the nature of the defense." *Lawrence v. Chabot*, 182 F.App'x 442, 456 (6th Cir. 2006) (citation omitted) (holding that a one-line sentence, "Plaintiffs' claims are barred by the doctrine of res judicata," was sufficient because it gave the plaintiff notice of the defense."). Here, Defendants summarily pleaded the defense, which is sufficient.

Plaintiffs had notice of the statute of limitations claim. Plaintiffs must therefore point to an adverse action within the 90-day period to have an actionable WPA claim. *See Moyer v. Comprehensive Rehab. Ctr., Inc.*, 292061, 2010 WL 3604680, at *3 (Mich.Ct.App. 2010) (holding that that to "allow recovery for a [WPA] claim that was not within 90 days of the occurrence of the WPA violation 'is simply to extend the limitations period before that which was expressly established by the Legislature.'"). Plaintiffs have failed to point to an adverse action within the time frame. Plaintiffs' WPA claim cannot survive.

### 2. Plaintiffs are MDOT's independent contractors and the WPA does not apply to them

Plaintiffs argue that they are employees, as defined and protected by the WPA. (Am. Compl. ¶ 214.) Defendants argue that Plaintiffs are not MDOT's employees and instead are independent contractors, to which the WPA does not apply. (Defs.' Mot. at 40.)

The WPA defines employee as "a person who performs a service for wages or other remuneration under a contract of hire, written or oral, express or implied," "including

employees of the state or one of its political subdivisions, but excluding the state classified civil service." *Chilingirian v. City of Fraser (on remand)*, 504 N.W.2d 1, 2 ( Mich.Ct.App. 1993) (quoting Mich. Comp. Laws § 15.361(a)).

"A 'contract for hire' is a legal term of art consonant with the term employee but not broad enough to include professionals who work as independent contractors. An attorney representing a client by retainer of some type has not agreed to work under a 'contract of hire,' but rather has agreed to perform professional services as an independent contractor for a specified sum or under a method of calculating a specified sum." *Chilingirian (on remand)*, 504 N.W.2d at 2.

To determine whether a person is an employee or independent contractor, courts apply the economics reality test. "The economics reality test looks to the totality of the circumstances surrounding the work performed." *Chillingirian v. City of Fraser*, 486 N.W.2d 347, 349 (Mich.Ct.App. 1992) (citation omitted). Relevant factors include: (1) control of a worker's duties; (2) payment of wages; (3) right to hire, fire, and discipline; and (4) performances of the duties as an integral part of the employer's business toward the accomplishment of a common goal. *Id.* (citation omitted). "All the factors are viewed as a whole and no single factor is controlling." *Id.* (citation omitted).

Defendants argue that the second factor weighs in favor of a finding that Plaintiffs were independent contractors. (Defs.' Mot. at 41.) Defendants state that MDOT pays BBF directly for "specific work performed." (*Id.*, citing Foster Dep. at 162.) Defendants then state that BBF plays Plaintiff Foster a salary. (*Id.*, citing Foster Dep. at 164.) Defendants state that MDOT does not withhold income taxes from BBF, nor provide BBF with a W-2

43

tax form, nor provide BBF or its employees with a 401k, similar pension, or health insurance.  (*Id.*, citing Foster Dep. at 163.)

Defendants also state that Plaintiff Foster admitted that MDOT does not participate in hiring, interviewing, or approve of hiring of employees.  (Defs.' Mot. at 41, citing Foster Dep. at 164.)  And Defendants argue that Plaintiff Foster has the final say in terminating and disciplining BBF's employees, although she considers MDOT's feedback.  (*Id.*, citing Foster Dep. at 165-66.)  Defendants also argue that Judnic and Steucher both testified that they did not have the ability to hire or terminate employees of consulting firms.  (*Id.*, citing Judnic Dep. at 168, Steucher Dep. at 93.)

Defendants also argue that the totality of the circumstances suggests that Plaintiffs were independent contractors.  (Defs.' Mot. at 42.)  Defendants maintain that Plaintiffs held themselves out to the public as maintaining an independent business, that they work for businesses other than MDOT, that they operated an independent office in Detroit, and that they perform all their work under specific contractual agreements. (*Id.*)

As to the merits of Defendants' independent contractor argument, Plaintiffs state that "MDOT's Project Engineers were controlling all facets of Plaintiff's operations."  (Pls.' Mot. at 45.)  Plaintiffs add that BBF's evaluation, on which appeared the statement, "[w]hen MDOT Project Management makes a decision about billing or staffing, BBF should adhere to the decision of MDOT without question or justification by MDOT," is telling as to whether MDOT had complete control over Plaintiffs and BBF's employees.  (*Id.*, citing Ex. 28.)

Here, Plaintiffs are independent contractors.  While MDOT and its project engineers had some control over Plaintiffs when Plaintiffs were working on an MDOT project, that

control is not dispositive in the independent contractor analysis. *See Glera v. City of Belleville*, 294959, 2012 WL 2335920, at *3 (Mich.Ct.App. June 19, 2012) (reviewing case law for the proposition that "employers who hire independent contractors can be expected to retain some level of control over those contractors without the contractors becoming employees; the key is whether the employer controls the method and manner of the contractor's work."). Other than alleging the one statement about billing and staffing, Plaintiffs have not shown what type of control MDOT or its project engineers had over their work when they were working on a project.

And the Court agrees with Defendants that MDOT only paid BBF for the contract work performed. And from that amount, BBF paid Plaintiff Foster a salary. MDOT did not pay Plaintiffs or BBF's employees any fringe benefits. *See Chilingirian (on remand)*, 504 N.W.2d at 2 ("Most significant is the fact that the city did not pay plaintiff his salary or wages; rather, the city was billed by the law firm on a monthly basis for the services rendered. The city paid for the services by issuing one check to the firm.").

The Court therefore finds that Plaintiffs were independent contracts, to which the WPA does not apply.

### 3. Plaintiffs have failed to establish the merits of a WPA claim

Defendants lastly argue that Plaintiffs cannot establish the elements of a WPA claim. (Defs.' Mot. at 43.) The Court again agrees with Defendants–even if Plaintiffs' WPA claims survived the statute of limitations or Plaintiffs were independent contractors within the WPA's reach, Plaintiffs have not established the elements of a WPA claim.

45

The elements of a prima facie WPA case: (1) the plaintiff was engaged in protected activity as defined by the act; (2) the plaintiff was discharged or discriminated against, and (3) a causal connection exists between the protected activity and the discharge or adverse employment action. *Wurtz v. Beecher Metro. Dist.*, 825 N.W.2d 651, 655-56 (Mich.Ct.App. 2012).

Defendants concede that Plaintiffs engaged in a protected activity when they filed their Title VI discrimination complaints in July, 2010.  (Defs.' Mot. at 43.)

Defendants argue, though, that Plaintiffs cannot establish that Defendants took an adverse action related to the filing of Plaintiffs' complaints.  (Defs.' Mot. at 43.)  They argue that the only adverse action that Plaintiffs allege involves the RFP with the leased vehicle requirement.  (*Id.*)  Defendants suggest that MDOT posted the RFP on July 16, 2010 and that Plaintiffs first filed a Title VI complaint July 27, 2010.  (*Id.*)  Defendants suggest therefore that no connection can exist between the filing of the complaints and the RFP requiring leased vehicles.  (*Id.*)

Defendants also argue that Plaintiffs did not have any contact with Steucher after July, 2010, so Plaintiffs' allegations of an adverse action against him fail.  (Defs.' Mot. at 43.)

Defendants finally argue that Plaintiff Foster does not know and has not alleged when Judnic or Steucher became aware of the complaints.  (*Id.*)  Defendants maintain that, if the employer lacked objective knowledge of a whistleblower's protected activity, then the whistleblower cannot make the causal connection between an adverse action and the protected activity.  (Defs.' Mot. at 43-44.)

The timing of Plaintiffs' allegations lead the Court to find that no causal connection exists between the filing of the Title VI complaints and any adverse action taken against Plaintiffs after that time. The Court also agrees that Plaintiffs have not shown when any of Defendants became aware of the Title VI complaints, thus Plaintiffs cannot satisfy the causal connection element. *See Roberson v. Occupational Health Ctr. of Am., Inc.*, 559 N.W.2d 86, 88 (Mich.Ct.App. 1996) (citation omitted) (affirming that the defendant was entitled to summary disposition when the plaintiff failed to establish that the defendant received any "objective notice of a report or a threat to report by the whistleblower.").

Plaintiffs spend the majority of their response to the WPA claim arguing that Defendants cannot raise a statute of limitations defense at this stage of the proceedings. (Pls.' Resp. at 42-45.)

Plaintiffs fail to address how they satisfy the elements of their WPA claim. On that failure, the Court finds that Plaintiffs' WPA claims also fail.

The Court GRANTS Defendants' motion for summary judgment with respect to the WPA claims.

## V.   Conclusion

For the above-stated reasons, the Court GRANTS Defendants' motion for summary judgment.[3]

s/Nancy G. Edmunds

---

[3]*McCormick v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012) (holding that "§ 1983 is the exclusive mechanism to vindicate violations of § 1981 by an individual state actor acting in his individual capacity."). The Court therefore dismisses the § 1981 claim.

47

Nancy G. Edmunds
United States District Judge

Dated:  August 12, 2013

I

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 12, 2013, by electronic and/or ordinary mail.

s/Johnetta M. Curry-Williams
Case Manager
Acting in the Absence of Carol A. Hemeyer